Filed 10/28/22  In re M.G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.G., et al., Persons Coming Under the Juvenile Court Law. | B317366 |
| | (Los Angeles County Super. Ct. Nos. 19CCJP03978 19CCJP03978 A-B ) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| K.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra Archuleta, Judge.  Affirmed

Anne Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

___

Mother K.G. appeals from the juvenile court's order terminating her parental rights over her sons, M. and K., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1] Mother filed a section 388 petition alleging changed circumstances and requesting return of the children to her custody, or alternatively, additional reunification services. The court denied mother's petition without a hearing. The court also denied mother's requests for a bonding study and a contested hearing prior to terminating her parental rights. Mother challenges these denials on appeal. We find no error.

The juvenile court also held that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) did not apply. Mother contends this holding was predicated upon a defective ICWA inquiry by the Los Angeles County Department of Children and Family Services (DCFS). We agree with mother that DCFS failed to conduct an appropriate inquiry into the children's possible Native American heritage. We agree with DCFS, however, that the error was harmless. We accordingly affirm.

## BACKGROUND

### I.    *Prior Dependency History*

Prior to the proceedings at issue, mother lived with her two children, M. (born 2013) and K. (born 2015), and maternal grandparents.[2] The family was the subject of three prior referrals to DCFS. In November 2013, DCFS received a referral of general neglect after M.'s teacher found a small amount of marijuana in the child's diaper bag. The incident was determined to be inconclusive and mother declined to participate in services. In 2017, a referral alleging emotional abuse reported that mother and her sister were

___

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    Neither M.'s father, R.O., nor K.'s father, S.V., are parties to this appeal. We therefore detail only the facts relevant to mother and her appeal.

fighting in the presence of the children.  DCFS concluded the referral was unfounded.  In 2018, K.'s pediatrician reported concerns with K.'s development after K. came to the emergency room with strep throat and scarlet fever and then mother failed to appear for a follow up appointment.  The referral was closed as inconclusive.

## II.    *Referral and Petition*

On May 10, 2019, DCFS received a referral reporting an incident of domestic violence by mother.  On April 15, 2019, mother reportedly arrived home intoxicated and began hitting maternal grandfather (MGF).  When maternal grandmother (MGM) intervened and tried to separate them, mother kicked MGM in the stomach.  Maternal grandparents sustained scratches and bruises, but denied medical treatment and a restraining order.  The caller reported that the incident occurred in the presence of M. and K., who were "scared, terrified and crying."  Mother was arrested and released two days later.

A medical social worker, Katie Porter, told DCFS that maternal grandparents appeared to be "very afraid" of mother and disclosed that mother had issues with alcohol and marijuana.  Porter reported that the children had been living with maternal grandparents since birth and mother had been in and out of the home and had a history of domestic violence.  Porter opined that mother had "mild alcohol use disorder" and that her behavior was "unhealthy."  She noted that mother was referred to addiction services after a positive toxicology screen in 2016 but did not show up.

A DCFS children's social worker (CSW) met with M. (then six years old) at school on May 21, 2019.  Regarding the referral allegations, M. stated that MGF did not let mother in the house, but he did not know why.  He also said that mother "got mad" and hit MGM in the stomach, then MGM started to cry and told M. and K. to go to the bedroom. M. also stated that mother hit MGF and scratched his face.  M. said that MGF held mother's arm so she could not hit MGM again. K. was crying and M. was "a little worried" and cried "a little bit" as well.  M. also told the CSW about another occasion when mother drank beer and smoked while watching the children at a playground.

The same day, the CSW met with maternal grandparents and K. in their home.  MGF reported that mother currently lived with them but she

would come and go, staying there approximately half of the month. He stated that mother abused alcohol and marijuana, and that mother became rebellious and violent when she drank. He stated that he and MGM were the primary caregivers for the children. Mother was not employed.

Regarding the referral incident, MGF stated that mother came home drunk at about midnight, woke him up, and pushed him. She then grabbed him by the face. He took mother out of the bedroom where he was sleeping with M. and into the living room. He tried to restrain her as she hit and scratched him on the face and neck. Mother also kicked MGM in the stomach and threatened to take the children. During the incident, the children were scared and crying. MGF stated that mother had previously come home drunk but had never assaulted them before.

MGM told the CSW that mother previously came home drunk almost every weekend, but had not done so since the incident. She stated that during the incident, M. saw mother and MGF fighting. Mother threatened to take the children and tried to take K. from MGM. Mother kicked MGM and then tried to leave with K. MGM took the children to the bedroom and closed the door. M. was scared and crying and asked if the police were going to take mother to jail. Mother also threatened to kill MGF.

The CSW contacted mother on May 22, 2019 regarding the referral but mother declined to meet. Mother did not respond to subsequent calls and voicemails from DCFS.

On June 5, 2019, MGF reported that there had been no further incidents with mother, but that mother was blaming them for the DCFS investigation and accusing them of reporting the incident.

M.'s kindergarten teacher told DCFS that he was academically "below grade level." Mother had missed two parent-teacher conferences and once told the school she had not provided an updated phone number because she did not want to be called. M. had been absent 65 times that year and was frequently tardy, and mother would provide a note with an excuse such as that M. did not want to come to school.

The court detained M. and K. from mother on June 20, 2019 and placed them with maternal grandparents. DCFS notified maternal grandparents that mother needed to leave the home. Mother called the CSW the same day,

blaming the CSW for failing to speak with mother. The CSW explained the situation, but mother continued to blame DCFS and hung up.

DCFS filed a dependency petition on June 24, 2019 on behalf of M. and K. under section 300, subdivisions (a) and(b)(1).[3] In counts a-1 and b-2, the petition alleged that mother had a "history of aggressive and volatile behavior," including grabbing MGF's face and scratching his face and neck, and striking, kicking, and pushing MGM in M.'s presence. The petition further alleged that mother previously was verbally abusive and threatening to maternal grandparents. Count b-1 alleged that mother had a history of substance abuse and was a current abuser of alcohol and marijuana, rendering her incapable of caring for the children. The petition alleged that on multiple occasions mother was under the influence of alcohol while the children were in her care.

In the Indian Child Inquiry Attachment (ICWA-010(A)), DCFS reported that it was unable to conduct the required inquiry because mother "did not make herself available throughout the investigation." At the time of the petition, the whereabouts of both fathers were unknown.

Mother completed Parental Notification of Indian Status forms (ICWA-020) for both children on June 25, 2019. She checked the box stating, "I have no Indian ancestry as far as I know."

At the June 25, 2019 detention hearing, the court found a prima facie case for jurisdiction over M. and K. under section 300. At the request of counsel for mother and the children, the court released M. and K. to mother under the conditions that they reside with maternal grandparents, mother submit to weekly drug testing, with decreasing marijuana levels, mother immediately enroll in a substance abuse program, and DCFS would make

---

[3]     Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . . [¶] (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."

5

unannounced home visits.  The court also found that it had no reason to know either M. or K. was an Indian child within the meaning of ICWA.  The court ordered mother to keep her counsel, DCFS, and the court apprised of any new information relating to possible ICWA status.

## III.  *Jurisdiction/disposition Report*

DCFS filed a jurisdiction/disposition report, reporting on a meeting between the CSW, M., and mother on July 25, 2019.  When asked about mother's relationship with maternal grandparents, M. stated, "I don't know. I told a promise."  He was unable to elaborate and denied any physical altercations between mother and maternal grandparents.  M. also reported that mother drank alcohol and acted happy.

Mother told the CSW that she could not recall the incident because she was "too drunk," but recalled MGF holding her down.  She stated that M. and K. were not in the room.  She also denied any other physical altercations. She acknowledged getting into arguments with maternal grandparents and stated that "they get on my nerves."  Mother stated that she had participated in anger management classes when she was 15, but did not believe they were helpful.  Mother acknowledged having difficulty controlling her anger, stating that "when I get mad, I get really, *really* mad."  Mother denied having the children in her care while under the influence of alcohol or marijuana.  She acknowledged she was intoxicated on the night of the incident.

The CSW reviewed the instructions with mother regarding weekly drug testing.  Mother asked about using marijuana while the case was open and stated that she was "just going to use again when it's closed."  She reported that she had enrolled in a substance abuse program, but had enrolled in two prior programs and did not believe they were useful.  She repeatedly expressed reluctance to share information with DCFS because "you just want to use it against me."  Mother refused to discuss her current boyfriend and denied that the children had any contact with him.  Mother also stated that she had not had contact with M.'s or K.'s father since the birth of the children.

On July 17, 2019, MGF noted his frustration that mother expected maternal grandparents to act as the primary caregivers for the children, although the court had released them to mother.  He allowed mother to

return home after her arrest because she was sleeping on the street, but she did not change her behavior. On the weekend of July 13, mother took the children overnight to her boyfriend's house, which concerned him because the boyfriend reportedly used illegal substances.

The CSW again spoke with MGF on August 1, 2019. He expressed his ongoing concern that mother left the children with maternal grandparents for five or more hours on weekdays, at times not returning home until the next day. He stated that mother's behavior had not changed. He reported that mother had not come home under the influence of drugs or alcohol since the incident, but that mother remained friends with people who used those substances. He stated that mother's behavior caused ongoing stress for maternal grandparents and she could not live with them.

On July 24, MGM told DCFS that mother often left the children with her without any information about when she would return. She also stated that mother had instructed her not to say anything negative about mother to DCFS.

DCFS reported that mother enrolled in weekly drug and alcohol testing on June 27, 2019, but she did not appear for the first four weeks of scheduled tests, through July 22. DCFS concluded that the children could not safely remain in mother's care based on the incident with maternal grandparents, as well as mother's failure to test and denial that she had issues with alcohol use or anger management, despite her history. Further, DCFS noted that the "incidents that led to mother's previous enrollment in services remain unclear," because mother "continued to refuse to provide information." DCFS concluded that mother had not "gained any insight into her behaviors and continues to be unaware of how her . . . alcohol abuse, poor anger management skills, poor communication, and ongoing disagreements with [maternal grandparents] were conducive to her aggressive behavior" toward them.

In a last-minute information on August 20, 2019, DCFS reported that it had made contact with M.'s alleged father, R.O. He indicated that he had no known Native American heritage[4] and that he had never met M. DCFS remained unsuccessful in its efforts to locate K.'s alleged father.

_____

[4]     R.O. later completed a Notification of Indian Status indicating the same.

7

## IV. *Adjudication and disposition*

On August 20, 2019, the court continued the scheduled hearing to allow proper notice to both fathers. The court ordered on demand and random drug testing for mother, with DCFS to detain the children from mother if she tested positive, had an unexcused absence or diluted test, or left with the children.

In a last-minute information, the CSW reported that she scheduled a child-family team (CFT) meeting with mother. The day of the meeting, mother texted the CSW that she could not participate because she "needed to do something." Mother rebuffed the CSW's attempts to reschedule the meeting, stating that she would wait for the court's decision. Mother also refused the request to take the children for mental health screenings through the Department of Mental Health. Mother refused to sign a release to allow DCFS to verify her progress in services and refused to provide the contact information for her therapist. In August 2019, she missed two scheduled drug tests and twice tested positive for marijuana.

At the adjudication hearing on August 27, 2019, the court sustained the petition and found jurisdiction over M. and K. under section 300, subdivisions (a) and (b)(1). The court also found by clear and convincing evidence that it was reasonable and necessary to remove the children from their parents and that DCFS made reasonable efforts to prevent removal. The court found that mother had "completely disregarded every single one" of the conditions in the safety plan, therefore "demonstrating to the court that she did not have a commitment to keeping these children in her care." The court ordered the children to remain with maternal grandparents, provided mother had moved out of the home, and granted mother monitored visitation. The court also found that there was no reason to know that the children were Indian children under ICWA.

At the disposition hearing on October 16, 2019, the court found removal was necessary. The court ordered reunification services for mother with monitored visitation three times per week. Mother's court-ordered case plan included a full drug and alcohol program, a 12-step program, weekly testing, a parenting program, and individual counseling.

## V.    *Period of Review*

After the six-month review hearing was continued because of the COVID-19 pandemic, DCFS filed a status review report on March 25, 2020. During this review period, DCFS reported that M. and K. were "thriving" with maternal grandparents, who provided a stable and loving home and to whom the children were well-bonded. M. was improving in school and K. had begun speech therapy and was being assessed for a possible autism diagnosis. Maternal grandparents reported that M.'s attendance and grades at school had improved significantly over the past few months.  Maternal grandparents also stated that M. was doing well in the home and had adjusted to not living with mother.

Mother was consistently visiting the children, monitored by maternal grandparents, and had maintained communication with the CSW.  She was staying with her boyfriend but refused to provide his address to DCFS, stating it was not a stable place to live.  Mother had obtained a job at the post office.

However, DCFS also reported that mother had not complied with her case plan.  Mother had been inconsistent with testing.  She told DCFS that her first priority was getting a job, that she often missed testing because of her job, and that she had not had time to do any programs.  Mother also stated her belief that she did not need any programs, as her parents had forgiven her and she was now sober.  Mother had not provided any proof of enrollment in any programs.  Mother stated that she attended one AA meeting but she "does not have problems like the people there." Between October 16, 2019 and March 19, 2020, mother missed 12 tests and tested negative 11 times.

Mother consistently visited the children once per week for three or four hours at a time.  Maternal grandparents reported that mother was appropriate with the children and spent quality time with them.  M. told DCFS that he liked living with his grandparents and felt safe; he also asked when mother could return home.

DCFS concluded that mother had not addressed the issues that initiated the proceedings and recommended continuing family reunification services for mother.

DCFS filed another status review report on October 7, 2020. Mother continued her weekly visitation with the children, but maintained only "minimal" communication with DCFS. The CSW reported that mother would send sparse emails, but would not answer or return phone calls or answer questions posed by email. Mother had provided a certificate of completion for parenting classes, but otherwise refused to answer questions about that program or confirm whether she was participating in any other programs. Mother also missed all drug testing from April to July 2020. The CSW detailed multiple conversations with mother urging her to inform the CSW when mother missed a test, but mother stated that "it won't really matter anyways."

Between May and September 2020, the CSW attempted multiple times to follow up with mother by phone and email regarding participation in the court-ordered programs, including substance abuse, 12-step, and counseling. Mother did not respond or provide any proof of enrollment. Mother told DCFS that she made one mistake and was being punished for it, did not have a drinking or smoking problem, and did not need the court-ordered services.

DCFS observed that the children were closely bonded to and well cared for by maternal grandparents. Mother was in minimal compliance with her case plan and "has not shown a change in character or taken responsibility" for the conduct that initiated DCFS involvement, nor had she expressed urgency in addressing those issues. Thus, although mother was consistent and appropriate in her visitation, "it appears that mother is not in a place in her life where she is able to address and understand the issues that placed the children at risk of maltreatment." DCFS accordingly assessed the risk to the children as "very high" and recommended terminating reunification services for mother.

The court held a review hearing on October 7, 2020. The court found that mother had made minimal progress toward alleviating or mitigating the causes necessitating placement. Over DCFS's objection, the court continued reunification services for mother, setting an 18-month review hearing for January 2021.

In the next status review report filed December 22, 2020, DCFS reported that M. and K. continued to be happy and comfortable in the care of

maternal grandparents. Mother continued to be in minimal compliance with her case plan. She informed the CSW that she had enrolled in a substance abuse program in late October 2020, but did not provide an enrollment letter. Mother then reported in December that she had been discharged from the program due to illness. Mother stated that she intended to reenroll but did not provide a date. Mother had not provided any information regarding a 12-step program or sponsor, or enrollment in therapy, despite repeated communications from the CSW regarding her case plan.

DCFS also reported that mother's participation in testing had improved, as mother tested negative five times from October to December 2020. However, mother also missed four tests during that period. Mother stated that for three of the missed tests she was sick, but did not provide any documentation. Mother stated that she planned to complete her program and reunify with the children. She continued to have appropriate weekly visits with the children.

DCFS concluded that although mother had made some improvement in her drug testing, she continued to be inconsistent and had not taken responsibility for her past conduct or shown urgency in addressing her issues. DCFS also noted continuing difficulty in communicating with mother and in mother's availability to sign documents needed for services for the children. DCFS continued to assess the children as "very high" risk and recommended terminating services to mother.

In a January 2021 last-minute information, DCFS reported that mother sent letters showing she had attended two virtual NA meetings on January 12 and 13, 2021. However, mother missed three drug tests between December 15 and 28, 2020.

The court held the review hearing on January 26, 2021. The court found that continued jurisdiction was necessary, it would be detrimental to M. and K. to return them to mother, and that mother had only made minimal progress toward alleviating or mitigating the causes necessitating placement. The court terminated reunification services for mother and set the matter for a permanency planning hearing.

**VI.** *Termination*

DCFS filed a section 366.26 report on May 7, 2021. DCFS reported that M. and K. continued to do well with maternal grandparents, who were willing and able to provide permanent care for the children.

In a status review report on June 29, 2021, MGM stated that M. was doing well in school and was improving his behavior through working with a therapist. K.'s speech and confidence had improved from his work with a speech therapist and he was enrolled in kindergarten for the following year.

Mother continued to have regular weekly visits with the children. MGM reported that she had started to monitor visits in mother's home, she felt comfortable doing so, and mother engaged appropriately.

DCFS observed that M. and K. were stable, happy, and safe in the care of maternal grandparents. The children were thriving and progressing in their developmental and educational achievements, and recognized maternal grandparents as their "protectors and caregivers." DCFS thus concluded that it would be in the children's best interests to remain in the care of maternal grandparents, with the goal of adoption. At a permanency planning review hearing on July 22, 2021, the court ordered adoption as the permanent plan.

On July 27, 2021, DCFS informed the court that Pacific Toxicology had discovered an error in its drug testing. As a result, several of mother's tests from February and March 2021 were erroneously reported to DCFS as no shows, when mother had not been given timely notice of the need to test on those dates. The court recognized receipt of this information, possibly invalidating seven no-show test results between February and April 2021. However, the court noted that DCFS had conducted a reassessment of the case and determined that the erroneous tests did not impact the department's assessment or recommendation. Moreover, the erroneous test results had not been previously reported to the court, as they occurred after termination of family reunification services to mother.

DCFS filed an addendum report on August 25, 2021. Both children reported that they were well cared for by maternal grandparents. M. stated that he liked seeing mother, but understood, according to DCFS, that he "needs a stable home and responsible adults to provide care." K. reported that he liked living with his family and brother.

In a last-minute information on December 10, 2021, DCFS reported that mother was visiting the children "about once every two weeks," depending on her work schedule. The visits occurred at mother's apartment, monitored by MGM, who reported that the visits "go well and are appropriate." MGM told DCFS that mother frequently bought the children food and bought them an inflatable pool during the summer. MGM stated that the children "enjoy spending time with mother and are always happy to see her." Mother consented to allow maternal grandparents to take the children on a trip to see relatives out of the country in late December.

Mother filed a section 388 petition on December 13, 2021. She requested that the court change its order terminating family reunification services, instead returning the children to her. Alternatively, she asked the court to grant further family reunification services, including unmonitored visits, overnight visits, and increased visitation time. Regarding changed circumstances, she stated that she was "now fully case-plan compliant," including that she had completed a parenting program, "participates in individual counseling, is enrolled in full substance abuse program, attends AA meetings, and tests negative for her program." Specifically, she stated that she had been receiving weekly individual therapy since August 23, 2021. The attached letter from mother's therapist reported that mother "has demonstrated good follow through addressing treatment issues related to her DCFS case and why her case was open," and "continues to . . . identify maladaptive behaviors and learned [sic] how to replace them with more positive ones."

Mother also provided evidence of her enrollment into an "Intensive Outpatient Substance Use Disorder Program" on August 23, 2021, which included group counseling and random testing. The progress letter from the program stated that mother "has demonstrated commitment to the process of recovery, including attending 21 group counseling sessions and providing 7 negative tests as of October 19, 2021." Mother also provided two other drug test results, testing positive for marijuana on August 23, 2021, and negative on August 30, 2021. In addition, mother attached attendance sheets for an AA meeting on June 22, 2021. As a result, mother argued that she was "now case-plan compliant, sober, and able to assume the role of Mother."

Mother further argued that the requested change would be better for the children because she had maintained a bond with them through "consistent and meaningful" visits. She cited DCFS's visitation report in the December 10 last-minute information, and argued that returning the children to her or allowing an additional six months of reunification services would be in the children's best interests as it "would increase the likelihood of successful reunification."

The court held the permanency planning hearing on December 16, 2021. DCFS requested that the court terminate parental rights and proceed with adoption. Counsel for M. and K. agreed with the department's recommendation, noting that mother was only visiting the children "once every other week for roughly about three hours. I do not feel as if that is enough visitation to invoke the parent-child bond."

Mother's counsel requested that the court set the matter for a contested section 366.26 hearing and order a bonding study. She argued that the quality of mother's visitation with the children was good and that the children "resided most of their lives with mother as the custodial parent and continue to have a positive bond." She also argued that mother was now compliant with her case plan, as set forth in mother's section 388 motion. She therefore contended that a bonding study was appropriate to give a "deeper look into how the mother and minors are bonded," rather than "to just have a paragraph in the [DCFS] report to state that visits are appropriate, and visits are positive, those are just surface level."

The court found that mother's offer of proof was insufficient to establish a need for a contested hearing under *In re Tamika T.* (2002) 97 Cal.App.4th 1114 (*Tamika T.*). The court continued, "given the current posture of the case . . . I don't find the offer of proof is, frankly, specific enough to trigger setting the matter for contest. And I do believe that the issues that you are seeking to introduce have been fleshed out already." The court noted that because it had terminated family reunification services, "the court has to look for permanency and stability for the minor children. . . . I don't find the fact that [mother] has had visitation every other week, although I'm grateful and I'm sure the children are grateful that they see their mother every other week, I don't believe there's enough of a . . . parental role by mother" to establish a

14

basis for a contested hearing or a bonding study. The court concluded that "although mother's efforts are to be commended, . . . it's too little too late for these children," noting that the children were young and had been removed from mother in 2019. Accordingly, the court denied the request for a contested hearing, finding that the standard under *Tamika T.* had not been met. The court further denied the request for a bonding study, finding that it would not be helpful in this case, "based on visits every other week and lack of what the court sees is direct parental involvement on a frequent and consistent basis. I do not find mother has a parent role such that would be required from the court's perspective."

The court also stated that it had reviewed mother's section 388 petition "very closely" and denied the petition without a hearing. The court found that mother failed to establish a prima facie showing of a "sufficient change of circumstances" or that granting her petition was in the children's best interests.

Turning to permanency planning, the court found by clear and convincing evidence that M. and K. were adoptable. The court further found that, "although mother claims she's maintained regular visitation, a visit every other week with these children is not the kind of consistency and visitation the court would expect to see from a parent who is claiming that parent-bond exception." Further, the court found no evidence "that there is a sufficient bond with these children, other than mere visitation every other week." The court also found that any benefit to M. and K. from their relationship with mother was outweighed by the physical and emotional benefit they would receive through the permanency and stability of adoption. The court found that adoption was in the children's best interests, noting that they were placed together and in the home of maternal grandparents, where they had been for almost two years, and found by clear and convincing evidence that it would be detrimental to them to be returned to mother. The court also found that no exception to adoption applied, and therefore terminated the parental rights of mother and both fathers. The court further found that DCFS had complied with the case plan by "making reasonable efforts, including taking whatever steps are necessary to make and finalize

the permanent placement" of M. and K.  The court designated maternal grandparents as the prospective adoptive parents.

Mother timely appealed from the court's December 16, 2021 orders.

**DISCUSSION**

## I.  Denial of Section 388 Petition

Mother contends that the juvenile court erred in summarily denying her section 388 petition. She argues that she made a prima facie showing of changed circumstances based on her compliance with the case plan and the best interests of the children, and therefore the court abused its discretion by failing to conduct an evidentiary hearing.  We find no error.

### A.  *Legal Principles*

Pursuant to section 388, a parent may petition the juvenile court for modification of any previous order based upon changed circumstances or new evidence.  (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)  A parent may seek relief under section 388 even after the juvenile court has terminated family reunification services.  "After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.]  Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order."  (*Ibid.*)

To obtain modification of an order under section 388, the parent must demonstrate, by a preponderance of the evidence, both a change of circumstances or new evidence, and that the proposed change is in the best interests of the child.  (*In re Alayah J., supra*, 9 Cal.App.5th at p. 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)  In evaluating a section 388 petition, the juvenile court may consider factors such as "the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner."  (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)  The analysis is a searching one; the court may consider the entire factual and procedural history of the case. (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616.)  "In assessing the best interests of the child, 'a

16

primary consideration . . . is the goal of assuring stability and continuity.'" (*Ibid.*)

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Moreover, "[o]nce reunification services are ordered terminated, the focus shifts [from reunification] to the child's need for permanency and stability," and a presumption arises that "continued care [under the dependency system] is in the best interest of the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310.) After reunification services are terminated, inquiry into a child's best interests includes consideration of his or her need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526–527.)

On receipt of a section 388 petition, the court may either summarily deny the petition or order a hearing. (*In re Lesly G.* (2008)162 Cal.App.4th 904, 912.) Section 388 petitions "are to be liberally construed in favor of granting a hearing to consider the parent's request." (*In re Marilyn H., supra,* 5 Cal.4th at p. 309; see also Cal. Rules of Court, rule 5.570(a).) However, in order to proceed to a hearing, the petitioner must make a prima facie showing in his or her favor. (Cal. Rules of Court, rule 5.570(a); see also *In re Marilyn H., supra*, 5 Cal.4th at p. 310.) "'There are two parts to the prima facie showing: The parent must demonstrate (1) [either] a genuine change of circumstances or new evidence, and . . . (2) [that] revoking the previous order would be in the best interests of the [child].'" (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079; see also *In re Kimberly F., supra*, 56 Cal.App.4th at p. 529; Rules of Court, rule 5.570(d)(1) & (2).) "'If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing.'" (*In re C.J.W., supra*, at p. 1079; see also *In re Edward H.* (1996) 43 Cal.App.4th 584, 592 ["A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited."].) "'[S]pecific allegations describing the evidence constituting the proffered changed circumstances or new evidence' is required. [Citation.] Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a

hearing of the change in circumstances or new evidence.'" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250, citing *In re Edward H., supra*, 43 Cal.App.4th at p. 593.)

We review the juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re C.J.W., supra*, 157 Cal.App.4th at p. 1079.)

**B.   *Analysis***

The juvenile court found that mother failed to meet her initial burden to show both a genuine change of circumstances and that it would be in the children's best interests to reinstate reunification services or return them to mother's custody. As such, the court concluded mother was not entitled to an evidentiary hearing on her section 388 petition. We find no abuse of discretion in the court's summary denial.

The juvenile court did not err in finding that mother's petition failed to establish a prima facie case of changed circumstances. Although mother contended in her petition that she had "fully" complied with her case plan, the evidence did not support that claim. She did not begin participation in individual therapy, a drug and alcohol rehabilitation program, AA meetings, or consistent drug testing until August 2021, over two years after the children were removed from her care and more than eight months after termination of her reunification services. Further, the evidence mother presented did not show completion of, or extended engagement in, these services, but simply three months of participation in therapy and a rehabilitation program, attendance at a single AA meeting, and eight negative drug tests. Her therapist opined that mother "demonstrated good follow through addressing treatment issues" and was working on learning how to identify and replace her "maladaptive behaviors." However, the record also contained evidence of mother's refusal to cooperate with DCFS or comply with her case plan for over two years, including mother's repeated claims that she did not need services and did not have substance abuse issues. Apart from mother's conclusory statement that she was "sober and able to assume the role of Mother," her petition did not include any evidence that she was capable of assuming care and custody of M. and K., that she was committed to long term compliance with her case plan, or that she recognized the behaviors that led to DCFS involvement. We find no error in the juvenile

18

court's conclusion that mother's belated initiation of services, alone, did not establish a prima facie showing that she had addressed her case-related issues and was entitled to a hearing. (See, e.g., *In re Angel B.* (2002) 97 Cal.App.4th 454, 463 [upholding denial of hearing where mother relied on "simple completion" of classes and provided no evidence that she was "ready to assume custody" of child]; *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1451 [finding no prima facie case where appellant was "participating in a drug recovery program and testing clean," but previously had little contact with child and failed to participate in case plan].)

　　Similarly, we find no abuse of discretion in the juvenile court's conclusion that mother failed to establish a prima facie case that granting additional reunification services or returning the children to her custody was in the children's best interests. In her section 388 petition, mother cursorily stated that she had a bond with the children through "consistent and meaningful" visitation, pointing to observations by MGM in the DCFS report that her visits went well and the children were happy to see her. She provided no other evidence of the quality of visits and no further discussion of her purported bond with the children; nor did she dispute the evidence that she visited the children only once every other week. In contrast, there was ample evidence supporting the juvenile court's decision that the children's interest in permanency and stability would not be served by mother's requested change. At the time of mother's petition, the children had been involved in the dependency proceedings for over two years. DCFS consistently reported that the children were bonded to and comfortable with maternal grandparents, living in the same home they had shared since birth, and that maternal grandparents were willing and able to meet the needs of the children. Mother's conclusory argument that she had a bond with the children was not sufficient to establish a prima facie case that it was in the children's best interest to grant her petition. (See *In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250 [finding that a section 388 petition "may not be conclusory," and should include "declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence"].)

19

"A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. (*In re Edward H., supra*, 43 Cal.App.4th 584, 594.) '[C]hildhood does not wait for the parent to become adequate.'" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The court did not abuse its discretion in finding that mother's showing was "too little too late" to disrupt the children's lives and outweigh their interest in a permanent home with maternal grandparents.

## II. Termination of Parental Rights

Mother also contends the court erred in refusing her requests for a bonding study and a contested hearing in her attempt to establish the parental benefit exception to adoption. The court found mother had not established the exception and accordingly terminated her parental rights pursuant to section 366.36. We find the court did not abuse its discretion in denying mother's requests.

### A. *Parental benefit exception*

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ['"Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker."'].) Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can demonstrate one of the exceptions set forth in section 366.26 applies. (*In re Celine R., supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).)

The specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R., supra*, 31 Cal.4th at p. 53.) They "merely permit the court, in *exceptional circumstances* [citation], to choose an option

other than the norm, which remains adoption." (*Ibid*.; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The parental benefit exception, asserted by mother here, permits the selection of another permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).). In order to establish the exception, a parent must prove three elements: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

**B.** ***No error to deny request for bonding study***

In assessing the applicability of the parental benefit exception, "the primary issue often is whether the parents can establish that the child would benefit from a continuing relationship with them and that termination of parental rights would therefore be detrimental to the child." (*In re S.R.* (2009) 173 Cal.App.4th 864, 869, citing § 366.26, subd. (c)(1)(B)(i).) In attempting to establish or eliminate this exception, any party may request a bonding study, and the court has discretion to order one "to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored." (*In re S.R., supra,* 173 Cal.App.4th at p. 869; see also *Caden C., supra*, 11 Cal.5th at p. 633, fn. 4 ["Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony."].)

We review the trial court's order denying a request for a bonding study for an abuse of discretion. (*In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1341.) We ask "whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have

reasonably refrained from ordering a bonding study." (*Ibid*.; see also *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

Here, the juvenile court was within its discretion to conclude that a bonding study was unnecessary to evaluate mother's bond with the children. Notably, mother herself provided almost no evidence demonstrating that her bond was significant. She also did not dispute that at the time of her request, she was visiting the children every other week, which was *less* frequently than she had earlier in the proceedings. Moreover, mother has not explained why a bonding study was needed in this case, apart from the general statement that it would be "an important source of information." Under these circumstances, the court did not err in refusing to further delay permanency for the children by ordering a bonding study. (See *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197 ["Bonding studies after the termination of reunification services would frequently require delays in permanency planning."].)

### C. *No error to deny contested hearing*

Mother also contends that the court erred by finding mother's offer of proof insufficient to meet the standard under *Tamika T., supra*, 97 Cal.App.4th 1114 to warrant a contested hearing prior to terminating her parental rights. We are not persuaded.

In *Tamika T.*, *supra*, 97 Cal.App.4th at p. 1122, the appellate court held that a trial court may "require an offer of proof before conducting a contested hearing on one of the statutory exceptions to termination of parental rights." As the court explained, "[a] proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact. The offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued. (*Id.* at p. 1124.)

Mother acknowledges that it was not error for the juvenile court here to require an offer of proof regarding her claim to the parental benefit exception before ordering a contested hearing. But she argues that in finding the offer of proof insufficient, the court improperly required that she occupy a "parental" role with M. and K., which is not permitted under *Caden C., supra*,

11 Cal.5th at p. 628. We disagree that the juvenile court violated *Caden C.* in finding that mother failed to make a sufficient offer of proof.

As acknowledged by the appellate court in *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210, "the words 'parental role,' standing alone, can have several different meanings." The phrase could reflect a proper analysis of the parental benefit exception, or it could reflect factors disallowed under *Caden C.* (*Ibid.*) As explained by the Supreme Court, a court may not rely solely on "[a] parent's continued struggles with the issues leading to dependency," such as mental health or substance abuse, nor may the court assess "the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)," or "look to whether the parent can provide a home for the child." (*Caden C., supra*, 11 Cal.5th at pp. 634, 637.) Instead, the court must assess the strength and quality of the parent's relationship with the child and determine whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id.* at p. 638.)

Here, there is no indication in the record that the juvenile court improperly relied on mother's struggles with drug and alcohol addiction, anger, or her attributes as a caregiver in its analysis of mother's attempt to establish the parental benefit exception. Nor did the court cite the relative strength of maternal grandparents as caregivers as a basis to deny mother's request. Instead, the court found that mother's cursory offer of proof was insufficient the meet the *Tamika T.* requirement of a specific, evidence-based showing. This was not an abuse of discretion. Mother's counsel argued that mother had a "positive" bond with the children and that the quality of their visits were "good." This argument was not sufficiently detailed or supported by additional evidence in the record to require a contested hearing. The record thus demonstrates that the court properly focused on mother's evidence regarding her bond with M. and K. and whether that bond outweighed the benefits of their adoption. As such, mother has failed to demonstrate error.

## III. ICWA Inquiry

Mother argues that the court's finding that ICWA did not apply is invalid due to DCFS's failure to discharge its duty of inquiry into the children's possible Native American heritage. DCFS asserts that any inquiry

23

error was harmless, as mother makes no affirmative representation of Native American heritage on appeal.

### A. *Requirements*

Under ICWA, state courts must ask each participant in a child-custody proceeding "'whether the participant knows or has reason to know that the child is an Indian child.' [Citation.] The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.'" (*In re Y.W.* (2021) 70 Cal.App.5th 542, 551; see 25 C.F.R. § 23.107(a) (2021).) Additionally, state law "more broadly imposes on social services agencies and juvenile courts (but not parents) an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.'" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742; see also § 224.2, subd. (a); *In re Y.W., supra*, 70 Cal.App.5th at p. 551.)

The duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) If the inquiry gives DCFS a "reason to know" the child is an Indian child, then the formal notice requirements set forth in section 224.3 apply. (§§ 224.2, subd. (d), 224.3, subd. (a).) Alternatively, the juvenile court may find that a child is not an Indian child if the agency's "proper and adequate" inquiry and due diligence reveals no "reason to know" the child is an Indian child. (§ 224.2, subd. (i)(2); *In re D.S., supra*, 46 Cal.App.5th at p. 1050.)

"We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V.* (2022) 75 Cal.App.5th 433, 438; see also *In re D.S., supra*, 46 Cal.App.5th at p. 1051; § 224.2, subd. (i)(2).) If an inquiry is inadequate, we "must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly." (*In re Dezi. C.* (2022) 79 Cal.App.5th 769, 776, review granted Sept. 21, 2022, S275578 (*Dezi C.*).) "If so, the error is harmless and we should affirm; otherwise, we must send it back for the Department to conduct a more comprehensive inquiry." (*Id*. at p. 777.)

## B.    *Analysis*

The record in this case unquestionably supports mother's contention that DCFS failed in its duty of inquiry.  Aside from asking mother and R.O. about their Native American heritage at the outset of the case, DCFS did not ask any of the several relatives with whom it interacted whether the children or their parents might have Native American heritage.  None of the reports or other filings give any indication that DCFS broached the topic with anyone other than parents, despite, for example, extensive contact with maternal grandparents, who were more forthcoming than mother with information about the family for most of the proceedings.

DCFS acknowledges that its failure to inquire beyond mother's and R.O.'s initial denial of Native American heritage was error.  Accordingly, we must determine whether this error was harmless, "in other words, we must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly."  (*Dezi C., supra*, 79 Cal.App.5th at p. 777.)  The courts of appeal have devised at least four different analytical frameworks with which to assess whether a violation of ICWA's initial duty of inquiry is harmless.  (See, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 435 [concluding that "the error is in most cases ... prejudicial and reversible"]; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069-1071 [finding harmless error unless the parent makes a good-faith claim of Native American ancestry on appeal]; *In re Benjamin M., supra*, 70 Cal.App.5th at p. 744 [reversing where "there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child"]; *Dezi C., supra*, 70 Cal.App.5th at p. 779 [finding harmless error "unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding"].)

For the reasons articulated in *Dezi C., supra*, we conclude the "reason to believe" test is the most appropriate approach.  (See *Dezi C., supra*, 79 Cal.App.5th at pp. 779-785.)  Under this approach, "a reviewing court would have 'reason to believe' further inquiry might lead to a different result if the record indicates that someone reported possible American Indian heritage and the agency never followed up on that information; if the record indicates

that the agency never inquired into one of the two parents' heritage at all [citation], or if the record indicates that one or both of the parents is adopted and hence their self-reporting of 'no heritage' may not be fully informed [citation]." (*Id*. at p. 779.) "For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Ibid*.)

The record here provides no "reason to believe" M. or K. is an Indian child. Mother informed DCFS she had no Native American heritage in June 2019, R.O. did the same a few months later, and neither parent provided any updated information throughout the proceedings. Nothing elsewhere in the record or appellate briefing suggests otherwise. There is also no indication in the record that the self-reporting from mother and R.O. was not fully informed. As to K.'s father, mother had no contact information for him or any of his family members, and DCFS's efforts to locate him throughout the case were unsuccessful. Under the *Dezi C.* framework and the circumstances presented here, the inadequate ICWA inquiry is harmless.

## DISPOSITION

The orders denying mother's section 388 petition and terminating her parental rights are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



MANELLA, P. J.



CURREY, J.


26